972 F.2d 341
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
ST. PAUL Fire & Marine INS. CO., Plaintiff-Appellee,
v.
DRESSER IND., INC., Defendant-Appellant,
and Edward S. Digges, Jr.; James T. Wharton; David A.
Levin; Digges, Wharton & Levin, Defendants.
 No. 91-2238.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 4, 1992
Decided: August 10, 1992
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Joseph C. Howard, District Judge. (CV-89-2705-JH)
 ARGUED: Benjamin Richard Civiletti, Venable, Baetjer & Howard, Baltimore, Maryland, for Appellant.
 Richard McMillan, Jr., Crowell & Moring, Washington, D.C., for Appellee.
 ON BRIEF: Douglas D. Connah, Jr., David J. Heubeck, Venable, Baetjer & Howard, Baltimore, Maryland, for Appellant.
 Andrew H. Marks, Kathryn D. Krimayer, Crowell & Moring, Washington, D.C., for Appellee.
 D.M.d
 Affirmed.
 Before HALL and PHILLIPS, Circuit Judges, and BUTZNER, SeniorCC OPINION
 PER CURIAM:
 
 
 1
 Dresser Industries appeals a declaratory judgment entered after a jury verdict in favor of St. Paul Marine & Fire Insurance Co. in this action concerning St. Paul's obligation to cover a $3.6 million tort judgment. We affirm.
 
 I.
 
 2
 Dresser Industries is a manufacturing company headquartered in Texas. It has been mired in asbestos-related litigation for the past decade. In 1981, it engaged the law firm of Piper & Marbury to defend it in actions brought in Maryland state and federal courts. Edward Digges was Piper & Marbury's managing partner in charge of the Dresser representation.
 
 
 3
 In 1984, Digges left Piper & Marbury and took client Dresser with him. With James Wharton and David Levin, Digges formed a new firm-Digges, Wharton & Levin ("DW & L"). By 1988, DW & L was representing Dresser in over one thousand cases.
 
 
 4
 Concerned about the size of DW & L's billings, Dresser conducted a "mini-audit" of the firm on May 5 and 6, 1988. The discrepancies uncovered in this review caused Dresser to believe that it had been vastly overcharged. After it failed to resolve its concerns in discussions with the firm's members, Dresser discharged DW & L on June 2, 1988. Further attempts to resolve the billing dispute continued for nearly two more months, but were unsuccessful.
 
 
 5
 Dresser sued DW & L and the individual partners on February 16, 1989. On August 30, 1989, the district court entered a summary judgment in favor of Dresser and against all defendants on Dresser's claims for fraud and deceit and breach of contract. On September 5, the district court also granted summary judgment on Dresser's claim against Wharton and Levin for negligently failing to ensure that Digges' billing of Dresser was proper and accurate. The total judgment against the firm and each partner, jointly and severally, was $3,634,801.92, including $510,386.99 in prejudgment interest.
 
 
 6
 The firm's fraud was simple. Digges devised a scheme of ad hoc "value billing," i.e. charge the client what the billing partner thought the services rendered were worth. Because this estimate generally exceeded what actual hours times the nominal hourly rate would produce, either the rate or the number of hours had to be inflated on the bills. The firm chose the latter. Outlandish numbers of hours were billed. Digges billed 5,800 hours in 1986; Levin's principal associate, Andrew Vernick, logged 537.86 hours in one month (over 17 per day). On nine occasions between January 1 and April 30, 1988, Vernick toiled for 24 or more hours in a single day, with his paramount effort-32.45 hours-on January 4, 1988.
 
 
 7
 In November, 1989, Digges was indicted for mail fraud. He was disbarred on January 18, 1990, and five days later he pled guilty to one count of mail fraud. He was sentenced to 30 months in prison and ordered to pay $1 million in restitution to Dresser.
 
 
 8
 St. Paul Fire & Marine Insurance was DW & L's malpractice insurer. It notified its insureds shortly after the entry of the judgments that it was denying coverage.[1] To protect itself, St. Paul filed this declaratory judgment action against Dresser, Digges, Wharton, Levin, and DW & L. St. Paul sought a declaration that it had no contractual obligation to pay Dresser's judgment.
 
 
 9
 A jury trial was held. St. Paul relied on five different clauses of its policy to deny coverage-Fraud and Misrepresentation, Dishonest Acts, Prior Acts, Legal Services, and Notice-and the jury was asked in a special verdict form to rule separately on each clause. The jury ruled in St. Paul's favor on all five clauses.
 
 
 10
 Neither Wharton nor Levin appealed, and the case against Digges was stayed because of his bankruptcy.[2] Only Dresser appeals.
 
 II.
 
 11
 St. Paul wins if any one of the five jury findings can be affirmed. The district court found the clauses unambiguous, and instructed the jury how to interpret them. As a result of this ruling, which Dresser attacks in part,[3] no extrinsic evidence was admitted to explain the insurance contract, no ambiguities were construed against the drafter, and no disputes of fact concerning interpretation were resolved by the jury. We will not consider all of the parties' sundry contentions on each of the five special verdicts, because we find two of the verdicts unassailable and therefore have complete confidence in the outcome.
 
 A.
 
 12
 "Dishonest Acts"
 
 
 13
 Like most liability insurance, the St. Paul policy does not cover criminal acts or intentional wrongdoing:
 
 
 14
 Dishonest Acts. We won't cover claims that result from the dishonest, fraudulent or criminal act or omission of any pro tected person or of anyone for whose acts the protected person is legally responsible.
 
 
 15
 But this exclusion doesn't apply to any protected person who didn't:
 
 
 16
 personally participate in committing any such act or omission; or
 
 
 17
 remain passive after having knowledge of any such act or omission.
 
 
 18
 There was plenty of evidence from which the jury could have found that, at the very least, Levin and Wharton"remained passive" after having knowledge of Digges' overbillings. Indeed, the evidence would support a verdict based on personal participation. First of all, Levin and Wharton had annual income of over a half million dollars apiece from the firm's business, and were doubtless aware that Digges' representation of Dresser was generating immense fees. Second, when Dresser notified Digges that it would conduct its "mini-audit" the next day, Digges frantically came to each of his partners with blank time sheets. He instructed each of them to fill out the sheets, using different handwriting and pens, to create the impression that different lawyers had kept them. Both complied, recruiting their wives' help in diversifying the handwriting, and Digges showed the phony time sheets to Dresser. Third, at about the time of the "miniaudit," several associates and non-equity partners, including Wharton's son, confronted Digges and Levin when they discovered the inflated bills. In his own words, the younger Wharton was "furious" at the misbilling, which was, in his opinion, obvious on the face of the bills. Levin sat passively while Digges bore the wrath of the younger attorneys.
 
 
 19
 Even if they be given the benefit of every doubt, Wharton and Levin were acutely aware of Digges' shenanigans by at least midMay, 1988. Wharton admitted as much on the witness stand.[4] The next couple of months were spent trying to work out a settlement with Dresser. Meanwhile, Digges destroyed many of the firm's files and records. On July 27, 1988, the firm sent a letter, which Wharton signed in Digges' name. This letter stated that" we cannot and do not agree that there were past overcharges or excessive billings." Dresser's president testified that he interpreted this letter as putting an end to negotiations and throwing down the litigation gauntlet.
 
 
 20
 Dresser's assault on the jury verdict on this clause is weak and ironic. Dresser argues that the court's instructions might have misled the jury into considering unrelated evidence of misbilling of other clients by Wharton and Levin as bearing on whether they personally participated in the fraud on Dresser. The court's instruction[5] is not as vague as Dresser suggests. Its focus is clearly on the overbilling of Dresser, and the court's failure to mention Dresser in every clause is no error.
 
 B.
 
 21
 "Prior Acts"
 
 
 22
 The St. Paul policy covers "claims made" during the policy period, even if the acts creating the liability arose before the policy went into effect. However, as a prerequisite to giving "prior acts" coverage, St.
 
 
 23
 Paul required the firm to certify that it had no knowledge of any potential claims against it. Wharton discussed the requirement with Digges and Levin and made the required representation on behalf of the firm. The policy provides:
 
 
 24
 Prior Acts. We'll cover claims based on a wrongful act that occurred before the effective date of this agreement, but only if all the following conditions are met:
 
 
 25
 The protected person involved had no knowledge of the prior wrongful act on the effective date of this agreement, nor any reasonable way to foresee that a claim might be brought.
 
 
 26
 The policy went into effect on May 5, 1988-oddly enough, the date the "mini-audit" began. The court instructed the jury that it had to find that Levin and Wharton had a reasonable way to foresee Dresser's claim on that date to deny coverage under this clause. The jury so found, and there was ample evidence from which it could reach that conclusion. In addition to the evidence catalogued in part II-A above, Dresser showed a pervasive pattern of overbilling involving many clients, from which Levin and Wharton could have foreseen overbilling of Dresser.[6]
 
 
 27
 Dresser constructs a strained argument that the district court's instructions "permitted" the jury to interpret the "prior acts" clause's "protected person involved" as the perpetrator of the act (i.e. Digges) rather than the protected persons applying for coverage (i.e. Wharton and Levin). Again, we find the jury instruction to be a lucid, correct statement of the law,[7] and we see no foundation for Dresser's speculation that the jury seized upon a distorted misinterpretation of it.
 
 
 28
 We need not address the jury's verdicts on the other three clauses, but will describe the parties' contentions in a footnote.[8] (Text continued on page 10) erage shown in the Coverage Summary are shared by all protected persons. We explain how in the Limits of Coverage section.
 
 
 29
 Dresser posits that "each is protected separately" overrides the fraud and misrepresentation clause's voiding of the policy for misrepresentation by "you or any other protected person." St. Paul concedes that every person is separately insured-if Levin were sued individually for some act of malpractice, he could seek coverage under the policy. On the other hand, it argues that the fraud and misrepresentation clause voids the policy if "any other protected person " has violated the clause.
 
 
 30
 In addition, St. Paul's policy covered only the firm's "legal services"; it is not an umbrella policy protecting every lawyer in any of his business and personal endeavors. The policy provides:
 
 
 31
 We'll pay amounts you and other protected persons are legally required to pay to compensate others for loss that results from an error, omission or negligent act committed in the performance of legal services.
 
 
 32
 Dresser argues that the court's instruction on "legal services" is insufficient:
 
 
 33
 In determining whether a particular act is a professional legal service, you must look not to the title of the person performing the act, but to the act itself. Business activities that are inherent in running a law practice may not be professional legal services.
 
 
 34
 Dresser contends that this instruction tells the jury only what may not be legal services; it offers no definition of what are legal services. The trial court rejected a detailed instruction offered by Dresser.
 
 
 35
 The final point of contention is DW & L's failure to promptly notify St. Paul of Dresser's claim. The mini-audit was held May 5-6, 1988. Dresser fired DW & L on June 2, 1988. Settlement negotiations continued for almost two more months, and ended with the July 27, 1988, letter from the firm to Dresser denying any overbilling. Nonetheless, the firm waited until March, 1989, after it had been sued, to notify St. Paul that Dresser asserted a claim against it. The policy contains a broad notice and cooperation clause, which requires notice of potential claims as soon as possible.
 
 
 36
 Dresser does not contend that prompt notice was given. Rather, it argues that St. Paul did not present sufficient evidence of"actual prejudice" to deny coverage under the notice provision. (Maryland cases forbid forfeitures of coverage for nonprejudicial delays in notice). St. Paul of course contends The judgment is affirmed.
 
 AFFIRMED
 
 37
 I knew May 26th there had been improper billing just upon what I was shown.... [The bills] were improper; he had overbilled. There was no question about that. I knew about the time. I could tell the time very easily.... It was obvious by looking at the bills that [Dresser] had presented at that meeting that to me they were simply not realistic.... Everything about [the bills] was just unbelievable.
 
 
 38
 I will now turn to the dishonest acts clause. This is an exclusion, so the burden of proof is on St. Paul. Because the Dresser judgment resulted from the dishonest and fraudulent overbilling of Dresser by a protected person, Mr. Digges, the policy provides coverage to Messrs. Wharton and Levin if they did not "personally participate in the dishonest act" and did not "remain passive after having personal knowledge of such act." Thus, in order for the clause to apply, St. Paul must show that Wharton and Levin personally participated in committing a dishonest act or that Wharton and Levin remained passive after having personal knowledge of any dishonest act.
 
 
 39
 Part of Dresser's judgment was based not on Digges' wrongful conduct, but on Wharton and Levin's own acts of negligent supervision. With respect to this claim, you must decide whether by May 5, 1988 Wharton and Levin had some knowledge that they themselves were acting in a negligent fashion....
 
 
 40
 If you find that as of May 5, 1988 Wharton and Levin knew they were taking no steps to assure that Digges' billing practices conformed to the rules of professional conduct, or that they were turning a blind eye to their suspicion of improper conduct by Digges, then you must find that the prior acts clause of the policy prohibits coverage....
 
 
 41
 Under the prior acts clause there is also no coverage if Wharton and Levin as of May 5, 1988 had any reasonable way to foresee that Dresser would bring a claim. If you find that as of May 5, 1988 Wharton and Levin had a reasonable way to foresee that a claim might be brought by Dresser for DW & L's overbilling, then you must find that the prior acts clause of the policy prohibits coverage.
 
 
 42
 This policy is void if you or any other protected person hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter concerning this insurance-either before or after a loss. Of course, everyone makes mistakes. Unintentional errors or omissions won't affect your rights under this policy.
 
 
 43
 Protected persons are people and organizations protected under this agreement.
 
 
 44
 Here's a list of protected persons and certain limitations on their protection. Each is protected separately. However, the limits of covthat its evidence of prejudice supports the verdict. Two Dresser principals testified that they were willing to work out a settlement in June and July, 1988. A St. Paul claims representative testified in a general way that St. Paul could have become involved sooner to collect information while informal settlement was still possible.
 
 
 
 [1]
 St. Paul had initially represented all defendants in Dresser's suit; however, it withdrew its defense of Digges early in the proceeding, when, through discovery, it became clear the Digges had perpetrated a massive fraud
 
 
 [2]
 Because the stay of the action as against Digges would have prevented the judgment from being final as to all claims of all parties, and there was no just reason to delay appeal, the district court directed entry of a final judgment as to the other defendants under Fed. R. Civ. P. 54(b)
 
 
 [3]
 Dresser's attack concerns the"Fraud and Misrepresentation" clause, on 6350 35 10 which we do not rely. See footnote 8 infra
 
 
 [4]
 Wharton testified:
 
 
 [5]
 The instruction:
 
 
 [6]
 In connection with this evidence, Dresser challenges the introduction of a single exhibit, a memorandum of a partners' meeting on which Digges had scribbled notes that show "value billing" goals of 3500-4250 hours per year per partner. Dresser complains that the memorandum was not properly authenticated. However, both Levin and Wharton identified the handwriting as Digges'. We see no abuse of discretion, and certainly not a reversible error, in the introduction of this single exhibit out of 400 introduced at trial
 
 
 [7]
 The "Prior Acts" instruction, in relevant part:
 
 
 [8]
 The focus of the parties' arguments is the "Fraud and Misrepresentation" clause, which provides:
 "You" is the law firm. "Protected persons" include the three partners and all associates. The district court instructed the jury that if any protected person knew, when the firm applied for the policy, that Dresser might make a claim based on the fraudulent billing, the policy was void.
 Dresser complains that the district court's interpretation and instruction amounted to directing a verdict. Dresser places all its eggs in the definition of "protected persons," which it asserts makes the fraud and misrepresentation clause ambiguous: